**Robert William CLAYTON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–86–165.**

Court of Criminal Appeals of Oklahoma.

Sept. 24, 1992.

Rehearing Denied Nov. 3, 1992.

Ron Wallace, Asst. Public Defender, Trial Counsel, Johnie O'Neal, Asst. Public Defender, Tulsa, Appellate Counsel, for appellant.

Allen Litchfield and Gordon Edwards, Asst. Dist. Attys., Tulsa, Trial Counsel, Robert H. Henry, Atty. Gen., William H. Luker, Asst. Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, Appellate Counsel, for appellee.

## OPINION

PARKS, Judge:

Robert William Clayton, appellant, was tried by jury and convicted of First Degree Murder (21 O.S.Supp.1983, § 701.7) in Tulsa County District Court Case No. CRF–85–2501. In accordance with the jury's recommendation, appellant was sentenced to death. From this Judgment and Sentence, appellant appeals. We affirm.

Shortly before noon on June 25, 1985, appellant, a grounds keeper at the South Glen Apartments in Tulsa, Oklahoma, told a co-worker that he was going to take a nap in the shop during the lunch hour. The co-worker returned from lunch to find that appellant was no longer there and that a woman, whom appellant had expressed an interest in earlier in the summer, had been murdered in her South Glen apartment.

Between 12:00 and 12:30 p.m. on that day, appellant arrived at the apartment of Helen Syphurs in another apartment complex close in proximity to the South Glen Apartments. He was breathing heavily and told Mrs. Syphurs that he had been in a fight with a couple of men who tried to rob him. He was shaking his hand and stated that he had broken it in the fight. After using the phone, appellant took a shower, wrapped himself in a towel, put his clothes in a paper bag, and called someone to tell them that due to personal problems he would not be back at work that day. Mrs. Syphurs then took appellant to the home of Don and Sharon Reinke, where appellant and his friend, Tony Hartsfield, also resided.

Appellant arrived at the Reinke's around 1:30 p.m. wearing a towel and carrying a paper sack. He changed clothes and reiterated that he had been in a fight. He told Mrs. Reinke that he needed to wash his clothes because they were bloody. Although Mrs. Syphurs testified that she had seen nothing on appellant's clothes, Mrs. Reinke stated that she noticed blood on the thighs and knees of appellant's overalls which appeared to still be wet. Appellant put his clothes into the washing machine but apparently dropped a blood-stained sock, which police officers later found, on the floor beside the machine. When Mr. Hartsfield and Mr. Reinke arrived home shortly thereafter, appellant told them that he had been in a fight. Both men noticed that appellant's hand was bothering him.

Shortly after 12:30 p.m. on the day in question, William Timmons returned home to his South Glen apartment for lunch. He had been at work since 7:30 a.m., but had spoken with his wife, Rhonda Timmons, at 10:30 a.m. when he telephoned her. Mr. Timmons testified that he received no answer when he called Rhonda at 12:25 p.m. Upon arriving, he noticed that the back door was unlocked and towels and a pillow were laying near the door where his wife evidently had been sunbathing. He entered the apartment and immediately noticed blood everywhere. Yelling for his wife and receiving no answer, Mr. Timmons followed a bloody trail through the apartment to his 18–month–old baby's bedroom where he found his wife's dead body slumped over in front of the baby crib. He called the police and took the baby outside where he waited for officials to arrive.

Officers and medical personnel arrived around 1:00 p.m. and unsuccessfully attempted to revive Mrs. Timmons. An autopsy revealed that she sustained twelve (12) stab wounds to the chest, neck, side and arms, a large bruise to the back of her head, a fracture to the front of the skull, a ligature mark on her neck possibly caused by her bikini top being pulled tightly around her neck, and numerous bruises and abrasions. The medical examiner opined that Mrs. Timmons died from multiple stab wounds and blunt head injuries and that all of the injuries were inflicted prior to death. He further testified that the victim could have lived fifteen (15) to thirty (30) minutes after having sustained the wounds, but likely would have lost consciousness after receiving the head wounds.

A forensic chemist who analyzed the crime scene concluded from blood splatter evidence that at least two, and possibly three, assaults occurred. The first assault was at the back door leading into the apartment. The second assault occurred inside the apartment. A third assault possibly occurred in the baby's bedroom.

After obtaining appellant's name from the apartment manager, as well as other information, police officers went to the Reinke's home to question appellant. Upon arriving around 3:30 p.m., the officers asked Mr. Reinke if "Randy Clayton" (one of appellant's aliases) was there. Mr. Reinke initially denied knowing him but subsequently went into the house to get appellant when the officers urged the importance of talking to him. Mrs. Reinke testified that appellant said he was going to run because the police were there. Mr. Reinke stated that he found appellant sitting on a back bedroom window and persuaded him not to run, but rather to talk to the police.

Mr. Hartsfield testified that as appellant went outside he told Hartsfield not to let the police find out about the folding knife which appellant usually carried. Mr. Hartsfield subsequently found the knife in the backyard about twenty-five (25) feet from the window on which appellant had been sitting, but did not inform the officers of its existence. Pursuant to a consent search, police officers discovered the knife the next day. Expert testimony established that the knife could have caused Mrs. Timmons' stab wounds. However, the expert could not determine whether the minute amount of blood found on the knife was of human or animal origin. During the search, the officers also found appellant's clothes in the washing machine, including the overalls on which Mrs. Reinke had earlier seen blood stains. No trace of blood could be found on the clothes which had recently been washed. However, the officers also found the aforementioned bloody sock which experts determined was stained with Type AB blood. Appellant has Type O blood, while the victim's blood was Type AB.

Appellant agreed to go to police headquarters for questioning. After being advised of his *Miranda* rights, appellant admitted stabbing the victim but only because she made sexual advances toward him. This statement was held inadmissible because the trial court found that appellant did not fully understand his rights. A subsequent confession containing similar information was admitted over appellant's objection. (*See* Part III(A) of this Opinion).

During the second stage of trial, the State presented evidence that appellant had used a folding knife to threaten and intimidate a rape victim and her boyfriend in Alabama. Further testimony by Mr. Hartsfield implicated appellant in a beating and robbery of a man in Pasadena, Texas. However, other testimony indicated that Hartsfield, rather than appellant, assaulted the Texas man.

In mitigation, appellant called a psychologist who testified that her examination and testing of appellant revealed that he had a full scale I.Q. of 68, placing him in the lower one to two percentile of the population. The doctor further testified that appellant exhibited passive, aggressive and paranoid traits in his personality, as well as a tendency to be dependent and submissive. She stated that he was emotionally immature and self-centered and unable to empathize with others. Finally, the doctor stated that appellant had disclosed that he had only finished the seventh grade and was mistreated by his alcoholic father.

## I.

### PRE–TRIAL ISSUES

#### A.

In his eighth assignment of error, appellant asserts that the trial court erred in overruling his motion to declare unconstitutional the statutes under which he was prosecuted. Specifically, he argues that when the Oklahoma Legislature amended 21 O.S.Supp.1985, § 701.13, they failed to limit the resentencing function for a first degree murder conviction to the same jury that convicted the defendant. He claims that this failure denies such defendants and himself a substantial right.

Title 21 O.S.1981, § 701.13(E)(2), granted this Court the authority to "[s]et [a death] sentence aside and remand the case for modification of the sentence to imprisonment for life." The 1985 amended statute instructs this Court to "[s]et the sentence aside and remand the case for resentencing by the trial court." In *Cartwright v. State*, 778 P.2d 479, 482 (Okl.Cr. 1989), a majority of this Court held that a defendant sentenced to death "can be resentenced under [Section 701.13(E)(2)] without violating due process or the *ex post facto* prohibition of either the Oklahoma or Federal constitutions." This writer dissented to the majority decision on the grounds that the statute should not be applied retroactively where no express provision for retroactive application was provided by the Legislature. *See Cartwright*, 778 P.2d at 483 (Parks, P.J., dissenting). Although I stand on this interpretation of the statute, I yield to the doctrine of *stare decisis* in holding that Section 701.13(E)(2)

does not violate either the Federal or Oklahoma constitutions. Since resentencing under the statute is not an issue properly before this Court, we need not address either the retroactivity aspect of Section 701.13 or appellant's nineteenth assignment of error, which also raises this issue. These assignments of error are without merit.

### B.

Prior to trial, the district court found that there was a doubt as to appellant's competency to stand trial and ordered that he undergo a competency evaluation. Appellant was examined on July 11, 1985, by Samuel J. Sherman, Ph.D., who determined that he was competent to stand trial. In a supplemental brief filed one week before oral argument, appellant contended that his conviction must be reversed because the record did not establish that a mandatory post-examination competency hearing was conducted prior to the resumption of criminal proceedings. *See* 22 O.S.Supp.1985, § 1175.1, et seq.

In an unpublished order dated July 23, 1990, this Court remanded this cause to the district court. and directed it to forward proof, if any, that a proper hearing was held, along with findings of fact concerning appellant's competency to stand trial. We further ordered:

> that in the event no such hearing was held, this case shall be considered remanded to the [district court] for the purpose of conducting a proper hearing. The district court should make findings concerning the feasibility of presently determining appellant's competency to stand trial in light of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), as well as findings on his competency to stand trial when he did.

On August 13, 1990, the district court filed a response to our order stating that it could not determine whether a post-examination competency hearing was held. Due to illnesses of defense counsel, the prosecutor and an expert witness, a hearing to determine the feasibility of conducting a retrospective competency hearing was not held until July 3, 1991. Thereupon, the district court found that it was presently feasible to conduct a hearing. At a subsequent proceeding, which concluded on September 12, 1991, a jury found that appellant was competent to stand trial when he did (February 25 to March 1, 1986). The findings in this regard were forwarded to this Court on September 16, 1991, and we permitted additional time for both parties to file supplemental briefs on this matter.

■ Initially, we must address one of the district court's findings of fact. The court noted that appellant filed an application for a competency evaluation on October 16, 1985, but withdrew the request on October 18, 1985. In its supplemental brief, the State argues that such withdrawal constituted a waiver of appellant's right to a post-examination competency hearing. We agree that such action constituted a waiver with respect to the October 16, 1985, evaluation request. However, no such action was taken by the defense following the original request and July 11, 1985, competency examination. Section 1175.4 mandates that a competency hearing be conducted after the accused has been examined. In the present case, there is no evidence to indicate that appellant was afforded his statutory right to a hearing following his July 11, 1985, competency evaluation, nor evidence to demonstrate that he affirmatively waived such a hearing. *See Kiser v. State*, 782 P.2d 405, 408–9 (Okl.Cr. 1989). Accordingly, we reject the State's waiver argument and address the merits of appellant's propositions regarding the feasibility and retrospective competency hearings.

■ Relying primarily upon *Pate v. Robinson*, appellant first contends that the trial court erred in finding that a retrospective competency hearing could be held and by subsequently holding the same. This Court has held that failure to conduct a competency hearing concurrently with trial is not *per se* violative of due process. *Boltz v. State*, 806 P.2d 1117, 1121 (Okl.Cr. 1991); *Anderson v. State*, 765 P.2d 1232, 1233 (Okl.Cr.1988); *Rowell v. State*, 699 P.2d 651 (Okl.Cr.1985). "[I]f a defendant's

competency at the time of trial can be meaningfully determined at a subsequent time on the basis of credible and competent evidence, then error committed by the district court in failing to hold a hearing at the proper time can be cured." *Boltz*, 806 P.2d at 1121. Furthermore, delays occasioned by a remand and continuances do not necessarily preclude a meaningful retrospective determination. *Id.*, citing *United States v. Makris*, 535 F.2d 899 (5th Cir.1976), *cert. denied* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977).[1]

■ In the present case, the trial court found that the following evidence/witnesses were available at a retrospective competency hearing: Various records as to examinations by medical personnel, psychologists, jail personnel, and witnesses of appellant at the time he stood trial; the judge who presided over appellant's trial; trial counsel; Dr. Sherman; Thomas A. Goodman, M.D., and Diane Williamson, Ph.D., who each conducted psychological evaluations of appellant in January and February, 1986; and William R. Barnes, D.O., the Tulsa City–County jail physician who observed appellant while he was incarcerated. As we found under similar circumstances in *Boltz*, "With such a wealth of available evidence, the trial court properly determined that a retrospective competency determination was feasible." *Id.* at 1121–22.

■ Appellant next claims that he was denied a fair competency hearing because the State called him as a witness to sponsor several exhibits he had signed while incarcerated in the City–County jail. Appellant claims that such action violated the Fifth Amendment to the United States Constitution and article II, § 21 of the Oklahoma Constitution. We note that appellant has failed to specify how such procedure violated his constitutional rights, and this Court is unable to discern any such violation. We therefore reject this assertion of error and find that the evidence presented at the hearing amply supported the jury's finding

that appellant was competent to stand trial when he did.

■ Appellant finally contends that our decision to remand this case for a retrospective competency hearing is in conflict with prior caselaw and thus denied him due process. *Wolfe v. State*, 778 P.2d 932 (Okl. Cr.1989); *Thomas v. State*, 777 P.2d 399 (Okl.Cr.1989); *Kelly v. State*, 735 P.2d 566 (Okl.Cr.1987); *Scott v. State*, 730 P.2d 7 (Okl.Cr.1986), are cited as authority for this proposition. In *Kelly* and *Scott*, this Court reversed the appellants' convictions because no post-examination competency hearing was conducted. In neither case did we discuss the possibility of holding a retrospective hearing. However, in both *Wolfe* and *Thomas* this Court acknowledged that it is possible to cure on remand a trial court's failure to hold a competency hearing at the time of trial. In *Wolfe*, we found that no meaningful retrospective hearing could be conducted under the particular facts of that case. *Thomas* was in fact remanded to the district court, which determined that it was not feasible to conduct a retrospective hearing. These later cases clearly set forth the procedure now utilized by this Court to correct a trial court's failure to conduct a post-evaluation competency hearing prior to trial. *See also Boltz; Anderson;* and *Johnson v. State*, 761 P.2d 484 (Okl.Cr.1988). Accordingly, appellant's right to due process of law was not violated.

## II.

## ISSUES RELATING TO JURY SELECTION

### A.

■ Appellant argues in his first assignment that the trial court erred in excusing a prospective juror for cause in violation of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The juror at issue, who was one of several venirepersons excused for their views and beliefs

---

1. It continues to be the opinion of this writer that failure to hold a post-examination competency hearing prior to trial mandates reversal. *See Anderson*, 765 P.2d at 1234 (Parks, J., dis-senting). However, as a matter of *stare decisis*, I yield my view to that of the majority of this Court.

regarding the death penalty, was questioned extensively by the prosecutor, defense counsel and the trial court on those views. Although his answers were at times confusing and perhaps contradictory, we note that the juror stated that before he could vote to impose the death penalty he would need to be absolutely certain of appellant's guilt; "beyond a reasonable doubt" was too low of a standard for him to recommend a death sentence. He further expressed that imposing a death sentence under this legal standard would "violate his convictions" and do violence to his conscience. (Tr. 370). This Court has stated that violence done to one's conscience is not the key point or consideration in excusing jurors for cause under the holding of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the seminal case on this issue prior to *Wainwright*. *See Banks v. State*, 701 P.2d 418, 422 (Okl. Cr.1985). It is upon these cases that appellant pins his argument.

■ The United States Supreme Court replaced the earlier *Witherspoon* standard in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and reaffirmed the propriety of the *Adams* standard in *Wainwright*. Thus, the appropriate test is "whether the juror's views would 'prevent or substantially impair the performance of his legal duties as a juror in accordance with his instructions and oath'." *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. The *Wainwright* Court further noted that deference must be paid to the trial judge who sees and hears the juror because the trial judge may be left with an impression "that a prospective juror would be unable to faithfully and impartially apply the law" even though such impression is not evident in the printed record. *Id.*, 469 U.S. at 425–26, 105 S.Ct. at 852–53. Under this standard, we find that the trial court did not abuse its discretion in excusing the prospective juror. The record indicates that the venireman would have had difficulty following the law as the trial court would instruct in relation to the burden of proof standard for both the guilt/innocence stage and sentencing stage. This difficulty would have substantially impaired the performance of his juror duties. Finding no abuse of discretion, we dismiss this assignment of error.

### B.

■ Appellant contends in his seventh proposition that the prosecutor violated his right to have the jury consider mitigating evidence. He claims the prosecutor questioned venirepersons about their views on, and the effect of, evidence that someone convicted of murder might have a different emotional background than themselves. Appellant argues that this questioning, in essence, "primed the jurors to ignore [the only mitigational evidence presented] and had secured their assurances that they would do so." (Appellant's Brief p. 60).

No objection was raised during voir dire with respect to any of the questions at issue. Consequently, we review for fundamental error only. *Thompson v. State*, 724 P.2d 780 (Okl.Cr.1986), *reversed on other grounds* in *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). We find that these questions did not preclude the jury from considering the mitigational evidence and, correspondingly, that no fundamental error resulted. This assignment is meritless.

### III.

### ISSUES RELATING TO GUILT/INNOCENCE

### A.

■ In his third proposition, appellant asserts that the trial court erroneously admitted his confession into evidence through the testimony of Tulsa Police Department Detective Parke. The record showed that appellant gave an oral statement to police officers after being read his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This oral statement was held inadmissible because the preliminary hearing magistrate found that appellant did not fully understand his rights. This fact became apparent when officers attempted to record the confession but terminated their efforts upon appel-

lant's eventual understanding and invocation of his right to counsel.

The officers then summoned Public Defender Pete Silva to counsel appellant, whereupon Mr. Silva instructed appellant not to discuss the matter further with the officers. Mr. Silva then left the premises and the officers proceeded to "book" appellant. Detective Parke asked appellant to provide his true name, address and social security number. After appellant complied with the request, Detective Parke started out the door of the interrogation room. However, appellant stopped the detective and indicated that he wanted to talk. Detective Parke reminded appellant of Mr. Silva's instructions and asked if appellant wanted Mr. Silva to return. Appellant stated that he wished to talk to the detective alone and proceeded to give an account of what transpired in the death of the decedent, as well as an incident which occurred earlier in Texas.

Appellant now claims that Detective Parke improperly reinitiated interrogation after he had invoked his right to counsel. He concludes that the second oral statement given to Detective Parke was tainted by the illegality of the first statement. We disagree and note that the questions which Detective Parke posed to appellant were merely inquiries necessary for proper booking procedures which did not amount to "interrogation." In *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), the Supreme Court held that for purposes of the United States Constitution and the *Miranda* rights requirements, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." The Court further held that interrogation under *Miranda* "refers not only to express questioning or its functional equivalent, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90 (emphasis added). *See also Kreijanovsky v. State*, 706 P.2d 541 (Okl.Cr.1985). Clearly, Detective Parke did not reinitiate inter-

rogation of appellant by asking his name and other necessary personal data because this is information "normally attendant to arrest and custody." Moreover, these questions certainly were not the kind which the detective should know were reasonably likely to elicit incriminating statements. Thus, no interrogation occurred.

▆ To support his argument that the previously given inadmissible statement tainted the confession to Detective Parke, appellant cites *A.L.T. v. State*, 614 P.2d 74 (Okl.Cr.1980). There, this Court found inadmissible a juvenile's confession even though police officers administered the *Miranda* warnings to the juvenile and his father prior to the confession. In that case, a police officer initially interrogated the juvenile without giving the requisite *Miranda* warnings. After the juvenile confessed to four crimes, the officers determined that the juvenile may have been involved in a homicide. The officers called in the juvenile's father the next day and explained the *Miranda* rights to both. Using the previously acquired information, a different officer then questioned the juvenile again and obtained a second confession. This Court held that the second confession was erroneously admitted at a prosecutive merit hearing because it was tainted by the illegally obtained first confession.

We find *A.L.T.* distinguishable from the case at bar simply because the officers in *A.L.T.* acquired the confession during a second "interrogation" after receiving information through an initial questioning which was illegal. In the instant case, the officers questioned appellant under the impression that he fully understood his rights. Appellant agreed to talk until he realized that he had a right to counsel at that time rather than later. The interrogation ceased and counsel was provided. Against his counsel's advice and Detective Parke's recommendation, appellant initiated the second conversation and admitted certain details about the murder. Detective Parke testified that he asked only a few questions, and those were only for clarity of what appellant was confessing. Under these facts, we do not find that the

first inadmissible confession tainted the second confession, as was the case in *A.L.T.* Because the confession was properly admitted, this assignment of error must fail.

### B.

Appellant contends in his fourth assignment that probable cause for arrest was lacking and, therefore, all the evidence gained as a result of the arrest was inadmissible. He raises this issue for the first time on appeal. The record reveals that appellant filed three (3) Motions to Suppress Statements. None of these motions raised an objection to the arrest, but rather appeared to be limited to suppression of the two oral statements, the first of which was suppressed. The evidence now complained of, with the exception of the second oral statement discussed above, drew no objection.

Moreover, appellant pled not guilty to the charges at his arraignment without contesting the legality of the arrest. This Court has long held that failure to timely object to the legality of an arrest prior to entering a plea to the charges waives appellate review of the issue. *Holliday v. State,* 755 P.2d 124, 126 (Okl.Cr.1988); *Carter v. State,* 738 P.2d 562, 563 (Okl.Cr. 1987). Consequently, we refuse to review this assignment of error further.

### C.

Appellant's second assignment of error concerns the trial court's admission of photographs of the victim's body which appellant characterizes as "gruesome and inflammatory," and therefore inadmissible. However, the test for admissibility of a photograph is not whether it is gruesome or inflammatory, but rather whether its probative value is substantially outweighed by the danger of unfair prejudice. *Nguyen v. State,* 769 P.2d 167, 171 (Okl.Cr.1988), *cert. denied* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989); *Jones v. State,* 738 P.2d 525, 528 (Okl.Cr.1987). *See also* 12 O.S.1981, § 2403. The trial court reviewed each of the photographs at issue prior to admission and specifically held that the

probative value of the exhibits outweighed any prejudicial effect they might have had on the jury. (Tr. 847–48). Additionally, the trial court reviewed many of the other photographs (which were made a part of the appellate record) but found that the photographs offered by the State were ones in which the body had been cleaned and the blood removed and were "the best of the pictures available." (Tr. 846–47). Moreover, the photographs were offered to show the location and extent of the wounds and to corroborate the testimony of expert witnesses. We find that the trial court did not abuse its discretion in admitting the photographs. *See Stout v. State,* 693 P.2d 617 (Okl.Cr.1984).

### D.

In his fifth assignment, appellant asserts that the trial court erred in allowing Kenneth Ede to testify as an expert on blood splatters. Appellant contends that the blood splatter testimony was incompetent because the State offered insufficient authority to establish that it has gained general acceptance as a recognized science or that Mr. Ede was an expert in the field.

Although this Court has recognized blood splatter analysis as a forensic science worthy of admission into evidence, *Farris v. State,* 670 P.2d 995 (Okl.Cr.1983), we initially note that appellant did not object to the evidence on this ground at trial. Defense counsel only challenged Mr. Ede's qualifications to testify as an expert. (Tr. 815–16). When a specific objection is made at trial to the admission of evidence, no different objection will be considered on appeal. *Hughes v. State,* 762 P.2d 977, 979 (Okl.Cr.1988); *Marks v. State,* 654 P.2d 652, 655 (Okl.Cr.1982). Therefore, this issue was not preserved for appellant review.

Regarding issue properly preserved, the decision whether a witness qualifies as an expert is within the sound discretion of the trial court. *Kennedy v. State,* 640 P.2d 971, 977 (Okl.Cr.1982). The witness in the case at bar has collegiate degrees in chemistry and extensive schooling in the scientific area in which he testi-

fied. He attended courses and seminars on blood splatter analysis and studied under who he considered to be the leading authority on the subject in the United States. Moreover, he had hands-on experience in blood splatter analysis and had testified about it well over a dozen times. We find no abuse of discretion by the trial court in admitting the expert testimony by Mr. Ede on the blood splatter analysis he performed. Consequently, we find no merit to this assignment of error.

### E.

■ Appellant's ninth proposition concerns alleged instances of misconduct by the prosecutor. Specifically, appellant contends that he was denied a fair trial because the prosecutor implanted in the jurors' minds that the death penalty was mandatory. The trial court sustained defense counsel's objection to the voir dire question in which this misstatement was couched and admonished the jury to disregard the question. This Court had consistently held that an admonishment cures any error which does not substantially affect the verdict. *James v. State,* 736 P.2d 541, 545 (Okl.Cr.1987); *McLeod v. State,* 725 P.2d 877, 881 (Okl.Cr.1986). In this instance, the admonishment cured any error which may have resulted.

■ Appellant further argues that the prosecutor attempted to "set an emotional tenor to the proceedings" by eliciting sympathy for the victim. (Appellant's Brief p. 67). He asserts that the State used tactics designed to inflame the jurors' passions, including a request to have the victim's husband demonstrate the position his wife was in when he found her and eliciting testimony that the victim was looking up at her baby as she died. Defense counsel interposed an objection to the husband's demonstration of the victim's position but did not object to the testimony that the victim's head was in a position such that she appeared to be looking at her baby. The admission of evidence is within the sound discretion of the trial court, and the court's ruling is not reversible where there is no showing of prejudice to the appellant or a breach of his fundamental rights. *Cooper v. State,* 671 P.2d 1168, 1173 (Okl. Cr.1983). We find no abuse of discretion in the trial court's admission of this evidence.

Appellant also contends that it was improper for the prosecutor to comment on the aforementioned evidence in closing argument. Many of the comments drew no objection and, therefore, were not preserved for appellate review. *Thompson,* 724 P.2d at 783–84. We find that all of the statements, except one, were fair comments on the evidence and within the permissible range of closing argument. *Id.* The one improper comment drew an objection which the trial court sustained. Any error which might have resulted from the comment was cured when the trial court admonished the jury to disregard it. *See James, supra.*

Next, appellant contends that the prosecutor attempted to elicit sympathy for witnesses, including the decedent's husband, the Alabama rape victim and the Texas assault victim. All of the questions asked pertained to proper and relevant evidence and the trial court correctly overruled appellant's objections. We find no error in the questions asked or the responses given to those questions.

■ The only argument that appellant makes which merits a detailed response from this Court concerns derogatory remarks the prosecutor allegedly made during the voir dire and cross examination of the expert witness who appellant called to present mitigating evidence. During voir dire examination, the prosecutor inquired of the witness regarding tests performed on appellant:

Q: Well, ma'am, how many of these tests have you performed?

A: At least seven or eight hundred.

Q: What is it, seven or eight hundred?

A: I didn't count, sir.

Q: How long have you been performing these tests?

A: I have been doing this as an independent psychologist in private practice since 1979.

Q: Well, have you ever had one go haywire on you?

A: Not that I know of, sir.

Q: You wouldn't know; would you?

A: Not necessarily.

Q: I didn't think so.

(Tr. 1044). The trial court sustained defense counsel's objection and admonished the jury to disregard the statement. The trial court honored appellant's request to recognize the witness as an expert in the field of psychometrics and direct examination of the witness proceeded.

During direct examination of the expert witness, the following objection was voiced by the prosecutor:

MR. LITCHFIELD: At this time, based on her last remark, I would interpose an objection to any further findings as to this particular e-c-m-i—m-i-c-i-c-e, whatever it is tests that she gave.

(Tr. 1050). Although the court reporter did not report it as such, the supplemental affidavit of Ron Wallace, defense counsel for appellant, avers that the prosecutor actually spelled the words "Mickey Mouse" in referring to the tests in his objection. It is difficult to tell from the record whether the prosecutor did, in fact, object in the manner defense counsel states in his affidavit. The State does not refute the affidavit or the allegation other than saying it does not appear in the record. We need not speculate what was actually said because even if we did find that the prosecutor referred to the tests as "Mickey Mouse," we now find that this comment and the earlier derogatory remark, although highly improper and unprofessional, were not unfairly prejudicial and did not rise to the level of impropriety warranting reversal or modification. *See Thompson,* 724 P.2d at 785.

F. .

■ Appellant asserts in his sixth assignment that the trial court erred in refusing to instruct the jury on the lesser included offense of First Degree Manslaughter. The trial court is to instruct the jury on every degree of homicide which the evidence in any reasonable view suggests.

*Lamb v. State,* 767 P.2d 887, 890 (Okl.Cr. 1988). It is within the trial court's discretion to determine whether sufficient evidence exists to warrant instructions of a lesser degree. *Rawlings v. State,* 740 P.2d 153, 160 (Okl.Cr.1987).

The evidence presented by the State showed that the attack began outside the victim's apartment and continued throughout it. Two State's witnesses testified about statements appellant made to them. Appellant told Detective Parke that the victim coaxed him into the apartment and made sexual advances and threats toward him in the kitchen. He then "blacked out" and woke up in the bedroom. When asked by another witness why he killed her, appellant told the witness that he "flipped out." This explanation of the killing, uncorroborated by any other evidence and contradictory to the direct physical evidence presented, fails to support a manslaughter instruction. Because we find that the trial court did not abuse its discretion, this assignment of error must fail.

IV.

ISSUES RELATING TO PUNISHMENT

A.

■ In his fourteenth assignment of error, appellant argues that he was improperly sentenced to death because the State used an unconstitutional aggravating circumstance, to wit, the murder was especially heinous, atrocious or cruel. Appellant also contends, in his sixteenth assignment, that there was insufficient evidence to support this aggravating circumstance. In *Stouffer v. State,* 742 P.2d 562, 563 (Okl. Cr.1987) (Opinion on Rehearing), *cert. denied* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988), we held that this aggravating circumstance is limited to murders preceded by torture or serious physical abuse. *See also Castro v. State,* 745 P.2d 394 (Okl.Cr.1987), *cert. denied* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). The jury instructions given in the second

stage of appellant's trial clearly set forth this standard. (O.R. 215).[2]

We find that the evidence supports the jury's determination that torture or serious physical abuse preceded death. The victim was stabbed twelve (12) times. The assailant began the attack outside the victim's apartment and continued attacking her throughout the apartment from the kitchen to the livingroom area, down the hall and into the baby's bedroom. Clearly, the victim was the recipient of serious physical abuse from the beginning of the attack until she died from the wounds as evidenced by the testimony of the forensic scientist. Furthermore, the victim was extensively beaten about the head and body and apparently strangled with her own bikini top. We find no error in these assignments.

### B.

In appellant's seventeenth assignment of error, he claims that the "continuing threat" aggravating circumstance, 21 O.S.1981, § 701.12(7), is vague and overbroad, that no particularized guidance has been provided to construe the same, that it is being evaluated in an arbitrary manner, and that the trial court should have specifically defined its elements. This Court has previously addressed these issues and held that "this aggravating circumstance is specific, not vague, and is readily understandable." *Liles v. State*, 702 P.2d 1025, 1031 (Okl.Cr.1985), *cert. denied* 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986).[3] We have also held that this circumstance is not being evaluated in an arbitrary manner. *Foster v. State*, 714 P.2d 1031, 1040 (Okl. Cr.1986), *cert. denied* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986). *See also Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Accordingly, we deem this assignment meritless.

### C. and D.

Appellant asserts in his twelfth assignment of error that he did not receive adequate notice of the evidence the State intended to present in the second stage of the trial. He further contends in his thirteenth assignment that the trial court erroneously overruled his Motion to Produce Evidence in Aggravation.

The State filed its Bill of Particulars on September 23, 1985. (O.R. 52). Appellant filed two (2) motions to produce on September 30, 1985. (O.R. 65 and 70–74). One of the motions, which specifically addressed the State's evidence in the sentencing stage, was overruled on October 21, 1985. (O.R. 5). However, the other motion was general and covered all aspects of the trial. The appearance docket discloses that this encompassing motion was to be complied with by the State. (O.R. 6). Moreover, an in camera hearing was conducted prior to trial at which the following was recorded:

MR. WALLACE: Judge, I had previously filed—this is my last motion, a motion for in camera inspection of the State's files and at this time, I would like to formally withdraw that motion for the reason that I have, on numerous occasions, talked to Mr. Litchfield for the State and Mr. Edwards, and they have, to my knowledge, gone through their file on numerous occasions. They have been very forthright in providing myself and Mr. Silva, Pete Silva, co-counsel in the case, with any of the items that we have been entitled to under our motion to produce. And having dealt with these two counsel before in other cases, I feel that they have no hesitation whatsoever, if they should come across something they may have inadvertently overlooked, they would provide it to us as soon as possible. They have always been and exhibit-

---

**2.** Although this writer is of the opinion that the "especially heinous, atrocious or cruel" aggravating circumstance is unconstitutionally vague both on its face and as applied, *see Foster v. State*, 779 P.2d 591, 594 (Okl.Cr.1989) (Parks, P.J., specially concurring), I yield to the "torture or serious abuse" standard adopted in *Stouffer* as a matter of *stare decisis*.

**3.** While this writer is "not presently prepared to abandon my opinion regarding the validity of the 'continuing threat' circumstance, I agree with appellant that more definitive guidance is needed." *Boltz v. State*, 806 P.2d 1117, 1126 (Okl.Cr.1990) (Parks, P.J., specially concurring).

ed conduct in the highest order in the past cases when I have dealt with them. I have no reason to doubt that they would do any less than that in this case.

MR. EDWARDS: Your Honor, just for the Record, to the best of my knowledge and, I think Mr. Litchfield would say to the [best of] our knowledge, we have given them everything they legitimately are entitled to.

THE COURT: Let the Record indicate then, that this motion on behalf of the Defendant has been withdrawn.

(Tr. 7–8). Thus, defense counsel expressed that he was in possession of all that he was entitled to under the law.

At the same hearing, defense counsel urged motions in limine and motions to suppress in-court identifications which were filed on December 9, 1985, well over two months before the trial. Three of the motions in limine concerned the aggravation evidence of incidents occurring in the States of Mississippi, Alabama and Texas. The in-court identifications which appellant attempted to suppress were by witnesses the State intended to call in the second stage with respect to a rape that occurred in Alabama. Clearly, appellant was aware of the witnesses to be called in aggravation and that they would possibly identify him as being involved in the Alabama rape. He was also aware that another witness would testify about an assault and robbery in Texas and that the witness would be able to identify appellant. Another witness would place appellant at the scene of the Texas crimes.

In its Notice of Evidence in Aggravation of Punishment, the State set forth sufficient facts to show how it intended to prove that "[t]he murder was especially heinous, atrocious or cruel." 21 O.S.1981, § 701.-12(4). The following excerpt from the document sets forth the language the State used to put appellant on notice of the second stage evidence the State would use to prove that appellant was a "continuing threat to society":

3. That the state of mind exhibited by the defendant, Robert William Clayton aka Randy Clayton aka Robin Clayton, shows a probability that he would commit further acts of violence in the future that would constitute a continuing threat to society in that the defendant is wanted for parole violations in Mississippi and is sought by the State of Alabama for the crime of Rape and the defendant has been involved in crimes of Robbery and Assault in the State of Texas. Further, that the callous nature of the instant offense herein alleged shows a probability that the defendant would commit future acts of violence.

(O.R. 79).

The language set forth above is similar to that which we found to constitute sufficient notice in *Ross v. State,* 717 P.2d 117, 122–23 (Okl.Cr.1986), *affirmed* in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Our holding in *Ross* thus supports the trial court's denial of appellant's motion. But we also note, as we did in *Ross,* that the purpose of the notice requirement is to allow the accused an opportunity to prepare a defense. *Id.* We have further held that pertinent information as to the aggravation evidence can be communicated verbally to strengthen the written notice already filed. *Wilson v. State,* 756 P.2d 1240, 1245 (Okl.Cr.1988); *Walker v. State,* 723 P.2d 273 (Okl.Cr. 1986), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). The State supplemented the record with an affidavit from the prosecuting attorney in which he stated that he and defense counsel discussed the aggravation evidence at length on several occasions. Appellant does not refute this supplement to the record. We find that the above-quoted language in the State's formal written notice, along with information that defense counsel received pursuant to witness lists, compliances with motions to produce and conversations had with the prosecution, afforded appellant sufficient notice to prepare a defense or an explanation for the alleged criminal conduct. *Walker, supra. See also Nguyen,* 769 P.2d at 174, and *Johnson v. State,* 665 P.2d 815, 823 (Okl.Cr.1982). Both assignments of error are dismissed.

## E.

 Similarly, we dismiss appellant's eleventh assignment in which he argues that the trial court erroneously admitted the in-court identification of appellant by the two aforementioned witnesses during the second stage. Both witnesses identified appellant's photograph as the man who raped one of the witnesses and threatened that witness' boyfriend prior to the rape. The photograph was part of a photographic lineup given to the witnesses on the day following the incident. Neither witness hesitated to identify appellant's photograph, nor did they identify anyone else in the lineup; both were certain that appellant was the rapist. They were also certain that appellant was the assailant when they identified him in court.

Appellant correctly notes that his picture was the only one made with a Polaroid-type camera. He argues that since the white border around the picture was different from the other pictures, the lineup was impermissibly suggestive and tainted the in-court identification. We disagree. All of the pictures depicted men with long, dark hair and mustaches. All of the men appeared to be roughly the same age and physical build. We find that the lineup was not impermissibly suggestive and did not give rise to a very substantial likelihood of irreparable misidentification. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), and *Bryson v. State,* 711 P.2d 932, 934 (Okl.Cr.1985). This assignment is, therefore, without merit.

## F.

 In his tenth assignment, appellant claims that the trial court erred when it submitted a verdict form containing an improper aggravating circumstance. One part of the verdict form listed the aggravating circumstances which the jury could find to exist with boxes for the jury to mark if they found that particular aggravating circumstance was established by the evidence. Listed on the form as a circumstance to consider was that the "murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution." (O.R. 228). That circumstance was not alleged by the State in the Bill of Particulars and was incorrectly listed on the verdict form.

During deliberations, the jury noticed the discrepancy and the foreman sent a note to the trial court asking why this form did not comport with the second aggravating circumstance listed on the Bill of Particulars, that being "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." (O.R. 139). The trial court conducted an in camera hearing and heard arguments from both counsel. Defense counsel admitted that he had approved the verdict form earlier but thereupon objected to the form on the grounds that the mistake in the form prejudiced the defendant. The prosecutor argued that the jury had not reached a decision regarding aggravating circumstances as evidenced by the fact that the boxes on the form were blank, and thus, the defendant was not prejudiced. The trial court determined that appellant suffered no prejudice due to the incorrect form. The judge then made the erroneous form a part of the record, called the jury back into the courtroom, submitted a new verdict form containing the proper aggravating circumstances, and sent the jury back to the jury room to continue deliberations.

Appellant urges this Court to consider this situation in the same manner we did in *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980). There, the trial court erroneously sent the jury back for further deliberations after the jury had returned with a non-unanimous verdict. This Court modified the jury's subsequent death sentence to life imprisonment because we found that the trial court's actions constituted a directed verdict and violated 22 O.S.1971, § 922. We do not find a directed verdict problem in the instant case. The jury did not return to the courtroom with an improper verdict as did the jury in *Irvin,* but rather noticed a discrepancy prior to marking their decision on the verdict form. Furthermore, we note that the trial court complied with the

applicable statute for the situation, 22 O.S. 1981, § 894, and took the necessary steps to insure that appellant was in no way prejudiced by the incident. *See Starr v. State*, 602 P.2d 1046 (Okl.Cr.1979). Consequently, we find no error in the trial court's decision to submit a corrected verdict form to the jury for their consideration. We also conclude that appellant was not prejudiced by the first verdict form which listed an incorrect aggravating circumstance.

### G.

■ Appellant's fifteenth assignment of error concerns the so-called "anti-sympathy" instruction given in the punishment stage of the trial. Specifically, he claims that the instruction precluded the jury from considering sympathy in their punishment deliberations and, therefore, violated his fundamental rights. The instructions about which appellant complains are virtually identical to the instructions which a majority of this Court found to be proper in *Fox v. State*, 779 P.2d 562 (Okl.Cr.1989), *cert. denied* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). Moreover, the United States Supreme Court has also reviewed the instruction at issue and found that its use was not error. *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).[4] Therefore, we find that the instructions as given correctly stated the law and were not violative of appellant's rights.

### H.

■ As his eighteenth assignment of error, appellant alleges that the trial court erred in failing to inform the jury *sua sponte* that unanimous agreement upon the mitigating circumstances was not required before each juror could consider them. On this basis, he contends that his sentence of death was imposed in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v.*

*North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). We disagree.

In both *Mills* and *McKoy*, the Supreme Court addressed the issue of capital sentencing instructions which *required* unanimity among jurors before they were permitted to consider a particular mitigating circumstance. The jury in *Mills* was instructed that it must unanimously agree upon the existence of any of the mitigating circumstances presented. In reversing the petitioner's death sentence, the Supreme Court held that the instructions and verdict form created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 367, 108 S.Ct. at 1860. In *McKoy*, the Court reversed the sentence of death because "the instructions and verdict form expressly limited the jury's consideration of mitigating circumstances unanimously found." *McKoy*, 494 U.S. at 444, 110 S.Ct. at 1234 n. 8. Both decisions reiterated the principle that a jury may not be precluded from considering any relevant mitigating evidence proffered by a defendant. *Mills*, 486 U.S. at 373, 108 S.Ct. at 1865; *McKoy*, 494 U.S. at 441, 110 S.Ct. at 1233, 108 L.Ed.2d at 380. *See also Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986), *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). "[A]llowing a 'holdout' juror to prevent the other jurors from considering mitigating evidence" violates this principle. *McKoy*, 494 U.S. at ——, 110 S.Ct. at 1231, 108 L.Ed.2d at 377.

■ We find the instant case readily distinguishable from the above cited decisions. In both *Mills* and *McKoy*, the Supreme Court held that a unanimity *requirement* concerning mitigating circumstances

---

**4.** It continues to be the opinion of this writer "that the use of an 'anti-sympathy' instruction in the second stage, where mitigating evidence has been introduced, improperly undermines the jury's consideration of mitigating evidence in violation of the Eighth Amendment." *Fox*, 779 P.2d at 579 (Parks, P.J., Concurring in Part/Dissenting in Part). However, I yield to the majority view as a matter of *stare decisis*.

resulted in a constitutionally ·infirm death sentence. However, neither decision mandates that a trial court instruct a capital sentencing jury that unanimity *is not required* before each juror can consider a particular mitigating circumstance. Because the instructions and verdict forms in the present case did not require unanimity regarding mitigating circumstances, nor could they reasonably have been interpreted to require such, we hold that the jury was not precluded from considering any of the mitigating evidence proffered by appellant. Accordingly, this assignment is dismissed.

## V.

### MANDATORY SENTENCE REVIEW

#### A.

Finally, pursuant to 21 O.S.Supp.1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances as enumerated in 21 O.S.1981, § 701.12(4) and (7).

#### 1.

From our review of the record, we cannot say that the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to § 701.13(C)(1).

#### 2.

■ With respect to the aggravating circumstances, the record indicates that the jury found that the murder was especially heinous, atrocious or cruel, and that there existed a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1981, § 701.12(4) and (7). In Part III(A) of this opinion, we held that appellant was not unconstitutionally sentenced under the first of the two aggravating circumstances, initially because the jury applied the appropriate standard under the instruction, and additionally because the evidence supported their determi-

nation. Thus, we again find that the aggravating circumstance that the murder was especially heinous, atrocious or cruel was properly found.

In Part III(B) of this opinion, we reaffirmed this Court's prior decisions concerning the propriety of the "continuing threat" aggravating circumstance. Evidence presented in support of this circumstance included an identification of appellant as the man who raped a witness and threatened the witness' boyfriend in Alabama and an assault and robbery of a man in Texas in which witnesses alleged that appellant beat the man in the head with a wrench causing severe and permanent injuries. The State also referred to the circumstances of the murder at issue in proving that appellant was a continuing threat to society. We believe that sufficient evidence was presented to support the jury's finding of this aggravating circumstance as well.

Upon careful consideration of the evidence in support of the aggravating circumstances, and appellant's evidence offered in mitigation, we find the sentence of death factually substantiated and valid under 21 O.S.Supp.1986, § 701.13(F).

Finding no error warranting modification or reversal, the Judgment and Sentence is AFFIRMED.

LANE, P.J., LUMPKIN, V.P.J., and BRETT and JOHNSON, JJ., concur.

LUMPKIN, Vice Presiding Judge, concurring.

I concur in the Court's decision in this case, however, I do not agree with the Court's implication that a *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), analysis is required in this case. The Court should simply note that *Mills* is not applicable to the Oklahoma capital sentencing procedure. The Maryland sentencing procedure is distinctly different from the procedure applied in Oklahoma. Therefore, the Court should refrain from creating a misconception that

*Mills* addresses the sentencing procedure utilized in Oklahoma.