**Loyd Winford LAFEVERS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–93–324.

Court of Criminal Appeals of Oklahoma.

May 16, 1995.

Order Denying Rehearing and Directing Issuance of Mandate June 21, 1995.

Robert J. Mildfeld, Catherina Burton, Asst. Public Defender, Oklahoma City, for defendant at trial.

Lou Keel, Susan Caswell, Asst. Dist. Attys., Oklahoma City, for the State at trial.

Vincent Antonioli, Asst. Public Defender, Oklahoma County Public Defender's Office, Oklahoma City, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## *OPINION*

CHAPEL, Vice Chief Judge:

Loyd Winford LaFevers was tried by jury before the Honorable Thomas C. Smith in the District Court of Oklahoma County. In Case No. CRF–85–3254 he was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7, and Third Degree Arson in violation of 21 O.S.1981, § 1403(A), After Former Conviction of a Felony. At the conclusion of the first stage of trial, the jury returned a verdict of guilty.[1] During sentencing, the jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that LaFevers would commit criminal acts of violence that would constitute a continuing threat to society; and 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. LaFevers was sentenced to death for the murder conviction and forty years incarceration for arson. From these convictions LaFevers has perfected his appeal, raising twenty-two propositions of error.

Around 10 p.m. on June 24, 1985, LaFevers and Randall Cannon[2] broke into 84–

---

1. Under Oklahoma law, capital trials are conducted in two stages. First, the jury determines the issue of guilt or innocence. If a jury finds a defendant guilty of first degree murder, the trial proceeds to a sentencing stage where the jury determines whether a sentence of life, life without the possibility of parole, or death is the appropriate punishment. 21 O.S.Supp.1989, § 701.10.

2. LaFevers and Cannon were initially tried together in March, 1986, and convicted of first degree burglary, first degree robbery, kidnapping, larceny of a motor vehicle, malice murder, third degree arson, first degree rape, and forcible

year–old Addie Hawley's house. The two ransacked the house, beat Hawley, forced her into her Buick, and drove off. At some point they put Hawley in the trunk. They stopped and filled a bottle or gas can with gas. Eventually LaFevers and Cannon stopped near a vacant lot, got Hawley from the trunk, beat her again, then poured gasoline on her and set her afire. They drove the Buick to another vacant area a short distance away and set it on fire as well. Witnesses saw the two with a gas can by the car and running from the scene. Before midnight, firefighters found Hawley still alive. She died about 5:30 a.m. of both blunt force head trauma and burns covering 60–65% of her body. Either injury would have caused death.

## PRETRIAL ISSUES

■ LaFevers argues in Proposition III that the trial court erred in overruling his motion to suppress his pretrial custodial statements and admitting these statements over his objection because he invoked his right to counsel. Where evidence taken in camera is sufficient to support a trial court's ruling that a defendant's statements are voluntary and admissible, that ruling will not be disturbed on appeal.[3] In LaFevers' *Jackson v. Denno* hearing Officer Mitchell testified he questioned LaFevers to determine the extent of his request for counsel.[4] LaFevers testified that he wanted an attorney when the talk turned to body samples because he knew this was serious, but he would have given body samples after talking with an attorney. As discussed below, evidence supported the trial court's ruling that LaFevers' statements were voluntary. Additional evidence pre-

sented at trial included cassette tapes of this interrogation.

LaFevers was arrested at about 8:00 a.m. on June 26, 1985, and Officer Mitchell began his initial questioning about 8:30 a.m. LaFevers waived his *Miranda* rights, answered questions for about fifteen minutes, and surrendered his shirt and shoes. Mitchell asked LaFevers if he would give the police body samples, and LaFevers said yes, as soon as he spoke to a lawyer. Mitchell assured LaFevers he had that right. LaFevers told Mitchell that he did not have a lawyer and that Mitchell would have to get him one. Mitchell asked whether he wanted the lawyer just for the body samples before talking further and LaFevers said he just needed to talk to one. Mitchell then asked if LaFevers wanted to terminate their interview; LaFevers said no, they could leave "this" on, gesturing at the tape recorder.[5] Again Mitchell asked LaFevers if he wanted to stop the interview since he said he wanted a lawyer. LaFevers asked when he could get a lawyer. Mitchell told LaFevers that it would be up to the courts, he could get a lawyer with no problem, and asked again whether LaFevers was finished talking. LaFevers said "No, I'll talk to you."

■ LaFevers argues that the trial court erroneously considered the totality of the circumstances, that LaFevers unequivocally invoked his right to counsel, that he equivocally invoked the right, that his final statement did not waive the right, and that admission of the statement was not harmless. A confession must be the product of an essentially free and unconstrained choice. When determining the voluntariness of a confession the court must consider the totality of the circumstances, including the character of

---

anal sodomy. On appeal this Court affirmed the first four convictions but reversed the latter four, holding that the defendants had mutually antagonistic defenses as to those charges and should be tried separately. *LaFevers v. State,* 819 P.2d 1362 (Okl.Cr.1991); *Cannon v. State,* 827 P.2d 1339 (Okl.Cr.1992).

3. *McGregor v. State,* 885 P.2d 1366, 1377 n. 20 (Okl.Cr.1994); *Turner v. State,* 803 P.2d 1152, 1158 (Okl.Cr.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991).

4. *Jackson v. Denno,* 378 U.S. 368, 393, 84 S.Ct. 1774, 1790, 12 L.Ed.2d 908 (1964) (established a defendant's right to an in camera hearing on the voluntariness of his confession).

5. LaFevers asserted at trial that in an inaudible statement just after this comment he again said that he wanted a lawyer. The trial court heard the statement differently. This Court's review of the tape does not support LaFevers' assertion.

the defendant and the details of questioning.[6] The trial court correctly looked at the entire context of the statement when determining that the confession was admissible.

▪▪▪ After a defendant asks for counsel he is not subject to further questioning unless he has counsel or reinitiates interrogation with law enforcement personnel.[7] When counsel has been requested, questioning must cease and officers may not initiate contact without counsel present whether or not a defendant has consulted with counsel.[8] Custodial interrogation equals both express questioning and any words or actions by police that they should know are reasonably likely to elicit an incriminating response; the focus is on the defendant's perception, not an officer's intent.[9] A defendant reinitiates interrogation when he represents a desire to open up a more generalized discussion relating directly or indirectly to a criminal investigation.[10]

LaFevers first argues that his statement, "Yeah, as soon as I talk to a lawyer", was an unequivocal expression of the desire for the assistance of an attorney in dealing with a custodial police interrogation.[11] LaFevers directs this Court to two recent cases in which an unequivocal request for counsel should have acted as a bar to further inquiry. In *Sattayarak v. State* [12] the questioning officer was clearly informed that the defendant had invoked her right to counsel, but began questioning after the defendant asked where they were going. This Court held that inquiry did not reinitiate contact sufficient to waive the previous invocation. In *Booker v. State* [13] officers continued questioning after the defendant said "I would rather talk to a lawyer, first," a clear and concise request for counsel. Both cases are distinguishable from LaFevers' situation. LaFevers argues that Mitchell interpreted his statements as requests for counsel, that Mitchell improperly questioned why he wanted counsel, and that in Mitchell's mind LaFevers had unequivocally invoked his right. One wonders how LaFevers can make this last assertion, which is certainly not supported by Mitchell's own testimony. Clearly Mitchell believed LaFevers had made some sort of request for an attorney, but the initial statement came in the context of body samples, after a valid *Miranda* waiver and after fifteen minutes of questioning. Nowhere did LaFevers unequivocally say that he wanted an attorney right then or wanted questioning to end.

▪▪▪ LaFevers then suggests that his initial statement may have been ambiguous but says his next two comments—that Mitchell would have to get him an attorney and that he just needed to talk to one—clarified his intentions. Courts must give a broad interpretation to requests for counsel where a defendant's words, understood as ordinary people would understand them, are ambiguous.[14] After a knowing and voluntary waiver of *Miranda* rights, law enforcement officers may continue questioning through equivocal statements until a suspect clearly requests an attorney.[15] Here, LaFevers' statements do not clearly indicate whether LaFevers wanted an attorney before he agreed to give body samples or simply wanted to stop talking altogether. Any ordinary person might find the exchange ambiguous, especially given LaFevers' repeated mention of a lawyer coupled with his refusal to say he wanted to

---

6. *Castro v. State*, 745 P.2d 394, 403 (Okl.Cr. 1987), *cert. denied*, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).

7. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

8. *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489 (1990).

9. *Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

10. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

11. LaFevers cites *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (holding that the courts would not infer a Fifth Amendment assertion from the attachment of a Sixth Amendment right on another charge).

12. 887 P.2d 1326 (Okl.Cr.1994).

13. 851 P.2d 544, 546 (Okl.Cr.1993).

14. *Connecticut v. Barrett* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987).

15. *Davis v. State*, —— U.S. ——, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994).

stop the interview. Mitchell followed the only reasonable course open to him. He avoided any substantive interrogation until the problem was clarified and questioned La-Fevers only regarding his willingness to talk and wish for an attorney. The record does not support any suggestion that Mitchell phrased his requests to urge LaFevers to talk, or that he gave LaFevers any impermissible advice. Contrary to the suggestion in LaFevers' brief, Mitchell did not tell LaFevers he would not receive counsel. LaFevers correctly contends that his final statement, "No, I'll talk to you," did not create any ambiguity in his previous statements. That statement resolved the considerable ambiguity to that point.

LaFevers' contention that his final statement, "No, I'll talk to you", was not a valid waiver, presupposes that this Court agrees LaFevers invoked his Fifth Amendment right. In fact LaFevers did not invoke his right to counsel prior to agreeing to continue talking. He made an ambiguous statement requesting counsel for some purpose which Mitchell went to considerable trouble to clarify. LaFevers' final statement, "No, I'll talk to you", was not a waiver of a previously invoked right but a clarification of an ambiguous request for counsel.

■■■ There was no error in admitting the statement. If there were, LaFevers' argument that its admission prejudiced him in both the first and second stages would fail. LaFevers' claim that the other evidence failed to connect him to the crime disregards the testimony of: Sam Cannon, who observed LaFevers just after the crimes and said LaFevers admitted the crime to him; Madden and Parkey, who testified regarding LaFevers' appearance and demeanor immediately after the crimes as well as his possession of Hawley's jewelry; several witnesses who saw men resembling LaFevers and Cannon (with the brown-haired man dressed like LaFevers) near Hawley's Buick where it was found; Goolsby, who confirmed how LaFevers was dressed, observed him after the crimes, and heard his comments to Sam Cannon; Ryan and Collins, who identified La-Fevers at Hawley's house and the car arson scene respectively; and Hawkins, whose testimony from the first trial presented LaFevers' jailhouse confession. The jury could have relied on this evidence in voting to convict.[16]

In the second stage, LaFevers' second statement admitting involvement in the Paden crimes [17] was used as proof for the continuing threat aggravating circumstance. Both Tammy Paden Austin and Anna Paden testified. Neither identified LaFevers, but both referred to their assailants as "taller" and "shorter" (LaFevers is taller than Cannon). Other evidence was also introduced to support the continuing threat aggravating circumstance, including the circumstances of the crime itself and two unadjudicated prison stabbings. Had LaFevers' statements not been admitted the jury could have relied on that evidence in support of that aggravating circumstance.

## JURY SELECTION

■■■ In Proposition IX, LaFevers argues his constitutional rights were violated by the use of "death qualification" voir dire questions. LaFevers cites no cases for this proposition, relying only on the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. LaFevers' pretrial motion challenging "death qualifying" questions was overruled. He claims that this violated his right to an impartial jury drawn from a cross-section of the community and created a State-prone jury likely to discount

---

16. As we determine that admission of LaFevers' first statement was not error, we do not reach LaFevers' contention that his second statement, made three days after the first and after waiving *Miranda* rights, was tainted by the first statement.

17. After the crimes against Hawley and after the bars closed, LaFevers and Cannon broke into the home of Anna Paden, an elderly woman living near LaFevers' half-brother or cousin. Paden and her granddaughter Tammy attempted to scare off the two by shooting; LaFevers and Cannon beat both women and stole a purse and the gun before leaving. Both women testified. LaFevers pled nolo contendere to several charges resulting from this episode. The jury was informed of the nolo plea, so these were adjudicated offenses offered as proof of the continuing threat aggravating circumstance.

defense evidence. He also claims this practice violates equal protection as it singles out capital cases and allows the State to exclude potential jurors from those cases only for their views on punishment. LaFevers fails to acknowledge authority from this Court approving such questions and setting forth the standard that each juror should be able to consider imposition of the death penalty as one punishment alternative in an appropriate case.[18] Questions whether jurors will follow the law or be generally fair will not suffice, as both parties must be satisfied that each juror will in good faith consider the aggravating and mitigating circumstances and determine if the latter prevent the imposition of the death penalty.[19] This proposition is denied.

## ISSUES RELATING TO GUILT AND INNOCENCE

 In his first proposition LaFevers claims that his prosecution under the alternative count of felony murder-kidnapping violated his fundamental rights of protection from double jeopardy and due process. LaFevers here correctly complains that he should not have been charged with the alternative count of felony murder, since the predicate felony relied on was the kidnap charge of which he was convicted in 1986 and which was affirmed by this Court in *LaFevers 1*. The State essentially concedes this point, as they should.[20] However, the basis for this prohibition is the principle that, where two alternatives exist and only one is constitutional or proper, a verdict cannot be upheld because the jury may have relied on an invalid alternative to reach a guilty verdict.[21] That is not the case here. Fortunately the jury received a verdict form for each alternative, and we know absolutely that La-Fevers was convicted of malice murder, not felony murder.

 LaFevers argues that this error was not harmless and requires reversal. LaFevers tirelessly and fruitlessly argued this issue pretrial and throughout the proceedings and objected on these grounds, thoroughly preserving the issue for review. Where a constitutional question is concerned, the State must prove beyond a reasonable doubt that the error did not contribute to the jury's verdict.[22] LaFevers complains that the first stage instructions may have confused the jury. The instructions required that the State must prove each element of the crime beyond a reasonable doubt and that any verdict must be unanimous, and listed the alternatives of malice and felony murder. These instructions fairly and accurately stated the applicable law, and there is no reasonable likelihood that the jury applied these instructions to prevent the consideration of constitutionally relevant evidence (especially as the jurors unanimously found malice murder).[23]

LaFevers also argues that his prosecution alone caused prejudice enough for reversal, apparently on the grounds that he was subjected to multiple punishment and that the State had the chance to rehearse its presentation and make it more effective. It is true that, but for the fortuitous separate verdict forms, he would have been subjected to multiple punishments. However, that does not end our inquiry. The issues are subject to a harmless error analysis. Even if LaFevers were charged only with malice murder on retrial, the evidence regarding the kidnapping would have come in under res gestae. Otherwise, the jury would be told LaFevers

---

**18.** *Duvall v. State,* 825 P.2d 621, 630 (Okl.Cr. 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992); *Banks v. State,* 728 P.2d 497, 502 (Okl.Cr.1986).

**19.** *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 2232–33, 119 L.Ed.2d 492 (1992) (holding the trial court must, at defendant's request, inquire sufficiently to discover jurors who would automatically impose the death penalty).

**20.** The State attempts to argue that LaFevers waived any double jeopardy protection by suc-

cessfully appealing his first convictions. This is creative but unpersuasive.

**21.** *Tibbs v. State,* 819 P.2d 1372, 1375–76 (Okl. Cr.1991); *Zant v. Stephens,* 462 U.S. 862, 869, 103 S.Ct. 2733, 2738, 77 L.Ed.2d 235 (1983).

**22.** *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Bartell v. State,* 881 P.2d 92 (Okl.Cr.1994).

**23.** *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).

burglarized and robbed Hawley and she was found beaten and burned in a field with her burning car nearby—leaving large and unnecessary gaps in the jury's understanding of the crime. The State did not unduly emphasize the felony murder alternative in argument. This Court can find, beyond a reasonable doubt, that the erroneous alternative of felony murder did not contribute to the guilty verdict because (1) the jury would have heard the evidence of kidnapping in any event, (2) the State did not overemphasize that evidence, and (3) the instructions were accurate.

In Proposition II, LaFevers claims that the trial court erred in denying LaFevers' plea of former jeopardy and collateral estoppel and subsequent motions to quash and dismiss based on these grounds. LaFevers argues here that this Court's opinion in *LaFevers 1*, while ostensibly a reversal and remand for separate trials, was actually a reversal based on insufficiency of the evidence, double jeopardy attached, and a retrial was barred. The only accurate statement in this proposition acknowledges the principle that double jeopardy bars retrial only where a conviction is reversed on appeal for insufficient evidence.[24]

LaFevers argues that the dissent in *LaFevers 1* criticized the majority's use of a sufficiency of evidence test, thus proving that the reversal was based on a finding of insufficient evidence of intent. In fact, the dissent focused on the majority's analysis of the mutually antagonistic defenses presented, suggesting the focus should be on principals, culpability, and an *Enmund*-like [25] analysis, and concluding that the defenses went only to degree of fault rather than exculpation. Far from suggesting that the majority made any findings as to sufficiency of evidence, the dissent seems to complain that it did not. Similarly, nothing in the published opinion

can be read to support LaFevers' claim. The majority reviewed the facts only to determine whether the proof of or defense to each element as to each defendant violated each defendant's right to a fair trial, given each defendant's claims that the other committed the crimes. The focus was on each defense and the evidence as to the other's intent that each defense provided, and not on the sufficiency of proof regarding intent provided by the State. The problem was that each defendant was convicted, not necessarily by the State, but by the other. There is absolutely no merit to this proposition.

LaFevers argues in his fourth proposition that the trial court erred in declaring David Hawkins unavailable and permitting the State to read his testimony from LaFevers' first trial. While in jail, LaFevers confessed to David Hawkins, describing his role in the crimes and specifically confessing rape, sodomy, ransacking the house, beating, and setting afire Hawley and her car. Hawkins testified to this at the first trial and was subject to extensive cross-examination and impeachment efforts. Between the first and second trial Hawkins recanted his testimony by filing, in LaFevers' case, a lengthy document entitled "Application for Citation—Indirect and Direct Contempt", which charged that Oklahoma County District Attorney Robert Macy and other district attorneys involved in the case had kidnapped him and forced him to give false testimony in the first trial.[26]

At an in-camera hearing during this trial Hawkins stated he wished to consult an attorney before speaking under oath, as he felt his statements might be inculpatory and might be used against him in the future. Hawkins did not mention perjury. The trial court thoroughly questioned Hawkins and established that he knew why he was there, and, while he believed he would be willing to

**24.** *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *Montana v. Hall*, 481 U.S. 400, 402–03, 107 S.Ct. 1825, 1826, 95 L.Ed.2d 354 (1987); *Edwards v. State*, 815 P.2d 670, 672 (Okl.Cr.1991).

**25.** *Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140 (1982), (holding that a defendant cannot receive a death sentence for murder unless he intended or con-

templated that the killing would take place, killed, or attempted the killing).

**26.** This was filed in April 1991. It is perhaps coincidental that, by that time, LaFevers had been involved in two inmate stabbings on Death Row, including stabbing Cannon shortly after the end of the first trial.

testify if he were represented by counsel, he would not make any statements under oath without such representation. The trial court refused to appoint counsel and ordered Hawkins to testify. Hawkins agreed, but took the Fifth at the first question, saying, "At this time, ma'am, I will have to exercise my Fifth Amendment right to silence." The trial court then stopped the proceedings and directly ordered Hawkins to testify again; after a brief discussion the following exchange took place:

> Trial Court: "I want to be sure that you know what you're doing, that you don't want to answer any questions here because, in your opinion, if you do answer, it might tend to incriminate you; is that right?"
>
> Hawkins: "Yes, sir, that is correct."
>
> Trial Court: "The Court finds that this witness is unavailable."

The history above clearly shows that Hawkins was declared unavailable under 12 O.S. 1991, § 2804(A)(2), refusal to obey a court order to testify, rather than § 2804(A)(1), refusal on claim of valid privilege, as LaFevers contends. The trial court never found that Hawkins was unavailable because he had claimed a valid Fifth Amendment privilege; Hawkins was unavailable because he directly, twice, disobeyed a court order to testify. LaFevers argues that Hawkins was willing to testify in the case but just wanted to check with a lawyer first. This is not supported by the record, in which Hawkins flatly refuses to testify. His statement that he might if he could talk to an attorney is speculative at best, not an expression of intent.

■ LaFevers argues that Hawkins was concerned, rightly or wrongly, about potential prosecution for perjury. The only statements in the record supporting this come not from the evidence, but from LaFevers' attorney's arguments to the trial court. Even if the assertions of perjury were proper matters for this Court's consideration, the whole perjury issue is a giant red herring. Hawkins disobeyed a court order and refused to testify. A trial court judge need neither argue with a witness and persuade him he has no Fifth Amendment privilege, nor ascertain specific reasons why a witness refuses to testify; the State has no affirmative duty to elicit reasons, and the witness's reasons need not be good or valuable.[27] The trial court here went to some pains to determine whether Hawkins would testify, and did not err in then declaring him unavailable.

■ LaFevers also argues his Sixth Amendment right to confrontation and cross-examination was violated. Although Hawkins was subject to extensive cross-examination and impeachment in the first trial, LaFevers was denied the chance to question him about his recantation of that testimony. LaFevers was able to enter into evidence pleadings in which Hawkins recanted his testimony, along with the subsequent several felony convictions he received. LaFevers used the recantation and convictions in argument, and the jury had this evidence to consider, along with testimony of several witnesses.

LaFevers argues any error in admitting this testimony cannot be harmless as without this testimony the evidence was insufficient to convict LaFevers of murder or arson. On the contrary, other evidence existed regarding both those crimes.[28] LaFevers was not

27. *Williamson v. State*, 812 P.2d 384, 402–03 (Okl.Cr.1991), *cert. denied*, 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992).

28. Corroborating evidence includes:

—In his statement to police LaFevers said he, Cannon, and Goolsby went to the Crazy Horse and Check Mate; wrecked his car and decided to steal a car; went to Hawley's house and broke open the screen door; kicked the front door; caught Hawley in the back yard and took her inside; pulled the telephone cord from the wall; took Hawley's keys and opened the garage; Cannon backed the car out and pulled Hawley into the car because she had seen his face; the two stopped and put Hawley in the trunk; then filled a 2-liter bottle with gas and drove to a vacant lot; took Hawley from the trunk after a passing truck left; LaFevers then left, Cannon followed with the car, drove it to another lot and set it on fire; afterwards they returned to the Check Mate.

—Witnesses saw LaFevers, Cannon, and Goolsby at the Crazy Horse and Check Mate clubs before the crimes; the three left the Check Mate about 9:30 p.m.

—Witness Volz saw men similar to the three pushing LaFevers' Camaro down the street on which it was abandoned, then one was seen

convicted of rape and sodomy, the only charges which were completely unsupported by any other evidence. This suggests that the jury did not rely on Hawkins' testimony alone if at all. LaFevers could have been convicted had the jury ignored Hawkins' testimony, and this proposition must fail.

█ In Proposition V, LaFevers argues that the trial court erred in permitting the State to read the transcript of Bessie Madden's testimony from the first trial, claiming Madden was not properly unavailable under 12 O.S.1991, § 2804(A)(5). Madden was a dancer at the Check Mate Club and observed both LaFevers and Cannon when they returned to the club after the crimes. LaFevers talked with Madden and gave her two rings, saying they were from an old friend and she might as well take them or he'd throw them away. One ring was identified as Hawley's wedding ring and the other, her "mother's" ring, contained the birthstones of her sons.

By the time of the first trial Madden was married, had taken her husband's name of McIntyre, and stated she lived in Tulia, Texas (she did not provide an address). The second trial began on March 1, 1992. Before the trial a counselor for the District Attorney's victim-witness coordinator office attempted to find Madden without success. The coordinator determined that the address and phone number on the 1985 Information were incorrect, spoke to Parkey (Madden's former employer at the Check Mate) about possible name changes, and found no Oklahoma driver's license listing for Madden under any known name. The coordinator did not recall any mention of Texas.

On February 22 the District Attorney's investigator began a search for Madden. He had a date of birth but no certain name, last known address or social security number. Using several names, the investigator ran utility checks in Oklahoma City, looked for a sheriff's record in Oklahoma County and with the OSBI, and checked with the Departments of Human Services, Corrections and Public Safety with no luck. The investigator also contacted Parkey, who thought Madden might be remarried, in Florida, and who knew of no Oklahoma relatives. He ran a Florida public safety check as well as an NCIC check, all without success. The investigator did not check the 1985 address as the coordinator had told him it was not good. He had no information suggesting that Madden would be in Texas. After hearing this litany of failure the trial court declared Madden unavailable and allowed her previous testimony to be read to the jury.

█ To introduce a witness's prior testimony, the State must prove both 1) the witness's actual unavailability despite good faith efforts and due diligence to secure the witness's presence, and 2) that the prior tes-

---

leaving as the other two walked away from the car.
—Goolsby said he left after the Camaro was abandoned, and the other two planned to steal a car; afterwards LaFevers smelled of smoke and his arms were singed; and he overheard LaFevers' remarks to Sam Cannon.
—Hawley's neighbor Ryan saw LaFevers and a man resembling Cannon open Hawley's garage door, put her in her Buick and drive off. He had seen the same men around the house on some previous day.
—While driving past, witnesses Gaither and Baker saw men resembling LaFevers and Cannon with a gas can near Hawley's Buick, and ran to the explosion and fire a few minutes later; witness Collins also saw this and identified LaFevers. Baker saw the men flee the scene.
—Later that evening after returning to the Check Mate, LaFevers gave Bessie Madden (McIntyre) two rings Hawley always wore, saying he got them from an old friend.

—Parkey, bartender at the Check Mate, confirmed that LaFevers returned there after 11:00 p.m., with cuts and scratches, and gave Madden the rings.
—Sam Cannon said LaFevers, Cannon and Goolsby came in the Crazy Horse early; that when they returned much later LaFevers had sooty deposits on his arms and face and smelled of gas; that LaFevers had previously said he would rob, kill and burn Hawley; that LaFevers afterwards reminded Cannon he said he'd "do it"; the next day LaFevers told the witness it all happened "just like the paper said".
—Ms. Roady, LaFevers' mother-in-law, took him to retrieve the Camaro the next day near Hawley's and Volz's houses, but let him off elsewhere when he saw police near the car.
—The medical examiner said Hawley died from burns and blunt head trauma.

timony bears sufficient indicia of reliability to allow its admission at trial.[29] The record must contain testimony regarding the State's efforts to find a witness.[30] LaFevers complains that the State's efforts here were not enough and claims the State was required to issue a material witness warrant and out-of-state subpoena to Madden's last known address. To the contrary, this Court has held those actions constitute due diligence but has not required them.[31] Parkey believed Madden might have remarried but did not indicate that Madden still lived in Texas; the State had no indication she was in Texas; and, the State went to considerable trouble to find her in the places they thought Madden might be. This search was not a sham but represented a good faith effort to locate the witness. LaFevers makes no serious claim that Madden's sworn testimony in the previous trial lacked sufficient indicia of reliability, and claims in error that the testimony was not cross-examined. Madden was subjected to cross-examination by both Cannon and LaFevers in the previous trial. The trial court did not err in declaring Madden unavailable and admitting her previous testimony.

 In Proposition VI, LaFevers contends the trial court erred in admitting a photograph of Hawley taken during the autopsy. This proposition has a somewhat confusing title. No photographs showed any autopsy procedures. In all photographs the body had been cleaned with saline solution pre-mortem and may have been cleaned by the medical examiner. One photograph, showing the burns on Hawley's side, appears to have had a view of the Y-incision redacted, but this would not be apparent to a person unfamiliar with autopsy photos. No photograph depicts anything other than LaFevers' handiwork. Photographs may be admitted if they are relevant and their probative value is not substantially outweighed by their potential for prejudice.[32] Given Hawley's causes of death, the photographs are not particularly gruesome. They are probative of the nature and extent of burns and wounds and corroborate the medical and fire examiners' testimony. The trial court did not abuse its discretion in admitting the pictures.

 LaFevers contends in Proposition XI that the trial court committed fundamental error when it did not provide the jury with an instruction defining the term "reasonable doubt". LaFevers did not request such an instruction at trial. LaFevers admits that this Court has consistently held that "reasonable doubt" is self-explanatory and any instruction on it is error,[33] but argues that, by analogy, the term should be defined just as terms of an offense are defined for a jury. LaFevers incorrectly claims that if the term is defined the definition must be correct, so failure to define the term is fundamental error. This does not follow logically from the premise that an instruction given to the jury must be accurate.[34] LaFevers offers no persuasive authority to sug-

29. *Davis v. State*, 753 P.2d 388, 391 (Okl.Cr. 1988); *Castro*, 745 P.2d at 401; *Ohio v. Roberts*, 448 U.S. 56, 74–75, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980).

30. *Henderson v. State*, 661 P.2d 68, 70 (Okl.Cr. 1983).

31. *Vuletich v. State*, 735 P.2d 568, 570 (Okl.Cr. 1987); *Lavicky v. State*, 632 P.2d 1234, 1238 (Okl.Cr.1981).

32. 12 O.S.1991, § 2403; *Mitchell v. State*, 884 P.2d 1186, 1196 (Okl.Cr.1994); *Williamson*, 812 P.2d at 400. LaFevers incorrectly suggests that probative value must substantially outweigh prejudice to a defendant.

33. *Underwood v. State*, 659 P.2d 948, 950 (Okl. Cr.1983); *Templer v. State*, 494 P.2d 667, 672 (Okl.Cr.1972).

34. *Sullivan v. Louisiana*, —— U.S. ——, 113 S.Ct. 2078, 2081–83, 124 L.Ed.2d 182 (1993) (finding that courts are not required to instruct on meaning of reasonable doubt but constitutionally deficient instruction cannot be harmless). The Supreme Court recently became enmeshed in the tangled web of pattern jury instruction definitions in Nebraska and California, ultimately holding that there was not a reasonable likelihood that the jury understood the instructions to allow conviction based on insufficient proof. *Victor v. Nebraska* and *Sandoval v. California*, —— U.S. ——, ——, 114 S.Ct. 1239, 1248, 127 L.Ed.2d 583 (1994). A review of those opinions confirms this Court's wisdom in refusing to allow such definitional gyrations.

gest that this Court should reconsider its previous decisions. This proposition is denied.

## INEFFECTIVE ASSISTANCE OF COUNSEL

 In Proposition VIII, LaFevers claims he was denied effective assistance of counsel. The test for ineffective assistance of counsel is whether (1) an attorney's performance is so deficient that the defendant did not have counsel as guaranteed by the Sixth Amendment, and (2) counsel's deficient performance created errors so serious as to deprive the defendant of a fair trial with reliable results. In capital cases, there must be a reasonable probability that, absent errors, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not equal a death sentence.[35] There is a strong presumption that counsel's conduct was professional and the defendant must overcome the presumption that counsel's conduct equalled sound trial strategy. On appeal this Court will (1) consider counsel's challenged conduct on the facts of the case as viewed at the time, (2) ask whether the conduct was professionally unreasonable, and, if so, (3) will ask whether the error affected the jury's judgment.[36]

 LaFevers claims that trial counsel failed to advocate his cause by failing to present relevant mitigating evidence that probably would have altered the outcome of the case. LaFevers contends counsel had (1) available evidence that he was suffering from drug-induced psychosis at the time of the crime, along with (2) drug-abuse and psychological profiles taken about the time of the

second trial, which could have been presented in either first or second stage as mitigating evidence. Upon examination these allegations fail to meet the standard set forth above.

LaFevers argues "ample" evidence showed he suffered from drug-induced psychosis. The only evidence introduced at trial which supports this claim is Hawkins' testimony that LaFevers said he'd been on crystal speed for three or four days before the crime. LaFevers' contention that he told trial counsel he'd been using methamphetamines, quaaludes, and marijuana, and had not slept for a week, is not reflected in the record before this Court. *LaFevers 1* notes that before the first trial LaFevers requested a psychiatrist to testify regarding the effects of PCP on his mental state, but determines merely that he completely failed to show sanity would be an issue at trial and thus was not entitled to have a psychiatrist appointed.[37] LaFevers fails again to suggest any such showing here, and certainly on this record counsel was not ineffective for not requesting such an appointment. Even if LaFevers could show any evidence supporting such a claim his cited cases mention but do not turn on drug-induced psychosis and do not support his argument.[38]

LaFevers appends two documents to his brief to support this proposition. These documents are not part of the record on appeal but a cursory review offers LaFevers no relief. Exhibit "A" is the Substance Abuse Subtle Screening Inventory (SASSI) evaluation prepared in January 1993 before the second trial. This indicates chemical depen-

---

35. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Coleman v. State*, 693 P.2d 4, 7–8 (Okl.Cr.1984).

36. *Miller v. State*, 751 P.2d 733, 740 (Okl.Cr. 1988).

37. *LaFevers 1* referred to PCP, which is not the same as crystal speed, methamphetamines, quaaludes, or marijuana.

38. *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (holding that in the context of hospital release of defendant found not guilty by reason of insanity, the State cannot commit defendant until he poses no danger if

defendant determined to be no longer insane; defendant had recovered from temporary condition of probable drug-induced psychosis); *Munn v. State*, 658 P.2d 482 (Okl.Cr.1983) (where defendant had drug-induced psychosis and personality disorder but was held sane, and where evidence of insanity plus State's improper questioning on insanity compelled sentence modification); *Roach v. Martin* 757 F.2d 1463 (4th Cir. 1985) (where defendant was retarded, had personality disorder and pleaded guilty, counsel was not ineffective for failing to investigate drug-induced psychosis since expert examined defendant and declared him competent at time of offenses and at trial).

dency with a history of years of drug and alcohol abuse and characterizes LaFevers as an addict. While it provides a lengthy list of abused substances it sheds no light on La-Fevers' ingestion of drugs at the time of the crimes. Exhibit "B" is a psychological evaluation from January 1993. It notes long-standing drug and alcohol use and says La-Fevers has below average intelligence, poor impulse control and judgment, average reality testing with no thought disorder and that he may have a personality disorder. The report notes LaFevers' sensitivity to family and psychological bonds with his children, along with test results suggesting that his "resentments" manifest themselves in accusations and violence toward family members.

Despite LaFevers' arguments, it is impossible to read these exhibits and believe there is any reasonable probability they would have affected the outcome of the case. At best Exhibit "A" depicts LaFevers as a troubled addict since his early teens. The jury heard Hawkins' evidence of "crystal speed" and evidence that LaFevers had been drinking at the Check Mate, and was specifically instructed that he was under the influence of alcohol and drugs at the time of the crime. Like Roach in *Roach v. Martin*, a psychologist examined LaFevers before trial and found he was immature, with poor judgment and a personality disorder, but sane. Given the evidence available to trial counsel, any failure to pursue a defense of drug-induced psychosis, or to offer that evidence in mitigation, appears to be the result of sound trial strategy. Although it might have been prudent to present Exhibits A and B in mitigation, counsel called seven witnesses in the first stage and thirteen witnesses in the second stage, including LaFevers' mother and son. The record shows counsel filed forty-five motions, two formal objections, and a special "plea" of former jeopardy after formal arraignment and before trial. Counsel made numerous objections and motions throughout trial. LaFevers was acquitted of the charged sex offenses. This Court cannot say counsel's performance was so deficient as to be professionally unreasonable or affect the jury's judgment.

## ISSUES RELATING TO PUNISHMENT

██ LaFevers raises thirteen issues related exclusively to the second stage of his trial. Under Oklahoma law, the death penalty may be imposed only if certain limited aggravating circumstances are found. Unless a murder, or the person who committed the murder, falls within one or more of the carefully circumscribed statutory aggravating circumstances, the death penalty may not be considered among the possible sentencing options. In LaFevers' case, the State alleged and the jury found three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) there existed a probability that LaFevers would commit criminal acts of violence constituting a continuing threat to society; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

 LaFevers argues in Proposition VII that the trial court erred in improperly allowing evidence of unadjudicated crimes and bad acts to be submitted to the jury. Second stage evidence admitted to show the aggravating circumstance of continuing threat included: prior to the crime LaFevers had been to Hawley's house and threatened to return and rob her;[39] in 1987, after the first trial, LaFevers and another inmate went after Cannon and stabbed him 22 times in prison; in 1990, LaFevers and yet another inmate stabbed a third Death Row inmate, Charles Coleman, in a prison library altercation, during which LaFevers also struggled with a prison guard. These unadjudicated incidents all took place before LaFevers' second trial. LaFevers' adjudicated actions at the Paden house also supported this aggravating circumstance. LaFevers concedes that this Court has held unadjudicated offenses are admissible to support a finding that a continuing threat aggravating circumstance exists. Any relevant evidence showing the probability that the defendant will commit

---

**39.** LaFevers calls this "the most prejudicial" evidence presented, but the cites in his brief do not match any transcripts submitted to this Court.

future acts of violence would support the finding that a defendant will be a continuing threat.[40] He offers no persuasive reason for this Court to reconsider its previous decisions.[41]

■ In Proposition X, LaFevers claims the trial court erred in failing to instruct the jury on the presumption of life, an instruction LaFevers unsuccessfully requested. Instruction No. 4 told the jury LaFevers was presumed innocent of the charges made in the Bill of Particulars, and that if they had a reasonable doubt as to his guilt they should return a noncapital sentence. Later instructions correctly set forth the burden of proof and the standards and procedures for weighing aggravating and mitigating evidence. LaFevers ignores the sizeable number of cases in which this Court has rejected this argument, and offers no reason for the Court to reconsider those decisions.[42]

LaFevers argues in Proposition XII that Oklahoma's death penalty scheme gives prosecutors unbridled discretion in seeking death sentences. LaFevers fails to address this Court's previous thorough discussion and rejection of this argument.[43] This Court recently addressed the issue again and again

determined that sufficient guidelines exist to direct prosecutorial discretion.[44] LaFevers offers no new arguments which would encourage the Court to reconsider these decisions.

■ In Proposition XIII, LaFevers contends the trial court erred in failing to instruct the jury that it had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. LaFevers unsuccessfully requested an instruction that the jury did not have to impose death regardless of its findings. A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but such an instruction is not required.[45] Instruction No. 4 required the jury to impose a noncapital sentence if it had a reasonable doubt as to LaFevers' guilt of the charges in the Bill of Particulars. Instruction No. 7 told the jury that it was authorized to consider imposing a death sentence upon a unanimous finding that aggravating circumstances outweighed mitigating circumstances. LaFevers ignores the many cases in which this Court has rejected this

---

**40.** *See, e.g., Malone v. State,* 876 P.2d 707 (Okl. Cr.1994); *Berget v. State,* 824 P.2d 364 (Okl.Cr. 1991), *cert. denied,* — U.S. —, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992); *Sellers v. State,* 809 P.2d 676 (Okl.Cr.1991), *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Johnson v. State,* 665 P.2d 815 (Okl.Cr.1982). LaFevers cites my dissent in *Paxton v. State,* 867 P.2d 1309 (Okl.Cr.1993), *cert. denied,* — U.S. —, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994), which disagrees with the use of unadjudicated offenses to support continuing threat. While I continue to disagree with the use of such evidence, I have not yet been successful in converting my colleagues.

**41.** LaFevers' cited Supreme Court cases do not support his argument that the nature of the second stage proceedings prevented him from rebutting allegations of unadjudicated crimes. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (trier of fact must give particular consideration to the circumstances of the crime and character and propensities of the defendant); *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (where the trial court disregarded jury recommendation and sentenced defendant to death based on a presentence report defendant did not have, depriving defendant of opportunity to deny

or explain information which in part formed basis for death sentence).

**42.** *Mitchell,* 884 P.2d at 1206; *Malone,* 876 P.2d at 713; *Allen v. State,* 871 P.2d 79, 103 (Okl.Cr. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994); *Brown v. State,* 871 P.2d 56, 73 (Okl.Cr.1994); *Trice v. State,* 853 P.2d 203, 215 (Okl.Cr.1993), *cert. denied,* — U.S. —, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Johnson v. State,* 731 P.2d 993, 1004 (Okl.Cr. 1987), *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987); *Walker v. State,* 723 P.2d 273, 284 (Okl.Cr.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986).

**43.** *Romano v. State,* 847 P.2d 368, 392–93 (Okl. Cr.1993), *aff'd,* — U.S. —, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

**44.** *Walker v. State,* 887 P.2d 301, 320 (Okl.Cr. 1994) (determining *U.S. ex rel. Silagy v. Peters,* 713 F.Supp. 1246 (C.D.Ill.1989), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), cited by LaFevers, is not persuasive because the Oklahoma and Illinois statutes differ).

**45.** *Parks v. State,* 651 P.2d 686, 693–94 (Okl.Cr. 1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

argument and offers us no reason to reconsider those decisions.[46]

■ In Proposition XIV, LaFevers claims that the trial court's jury Instruction No. 12 improperly engendered sympathy for the decedent and denied LaFevers his right to the jury's full and fair consideration of mitigating evidence. During the first stage the jury was instructed not to let sympathy enter into their deliberations. In the second stage, Instruction No. 12 told the jury that all first stage instructions would apply where appropriate and must be considered together with the second stage instructions. LaFevers unsuccessfully requested an instruction allowing sympathy for the accused. He relies on *Parks v. Brown* [47], which disapproved "anti-sympathy" instructions. LaFevers mistakenly characterizes that case's subsequent reversal as "procedural". *Saffle v. Parks* held that the Tenth Circuit had created a new rule not within any exception allowing for collateral review, so Parks could not have benefitted from the decision disapproving of the "anti-sympathy" instruction.

However, the Supreme Court also noted that the "anti-sympathy" instruction holding in *Parks* would contravene precedent, and rejected Parks' claim that the "anti-sympathy" instruction violated his right to individualized sentencing. LaFevers' contention that the instructions engendered sympathy for Hawley is inexplicable, as the jury never received instructions specifically allowing them to consider sympathy.[48] In addition, LaFevers disregards ample precedent where this Court has rejected this argument.[49]

■ LaFevers argues in Proposition XV that the jury instructions violated his constitutional rights by failing to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. LaFevers unsuccessfully requested an instruction telling the jury their findings on mitigating circumstances did not have to be unanimous. Oklahoma law does not require a unanimous finding of mitigating circumstances, which would be unconstitutional.[50] LaFevers ignores authority in which this

**46.** *See, e.g., Mitchell,* 884 P.2d at 1206; *Malone,* 876 P.2d at 713–14; *Allen,* 871 P.2d at 102; *Brown,* 871 P.2d at 73; *Robedeaux v. State,* 866 P.2d 417, 435 (Okl.Cr.1993); *Pickens v. State,* 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Fisher v. State,* 845 P.2d 1272, 1277–78 (Okl.Cr. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

**47.** 860 F.2d 1545 (10th Cir.1988), *rev'd Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

**48.** Since victim-impact evidence has led to a common modification of this instruction allowing the jury to consider sympathy generally, LaFevers' argument has become a standard complaint. The modified instruction was not given in this case. No issue of victim-impact evidence has been raised in this case, and no victim-impact evidence was presented at trial.

**49.** *Neill v. State,* 896 P.2d 537, 557–58 (Okl.Cr. 1994); *Revilla v. State,* 877 P.2d 1143, 1153 (Okl.Cr.1994); *Boyd v. State,* 839 P.2d 1363, 1372 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993); *Duvall,* 825 P.2d at 635–36; *Fox v. State,* 779 P.2d 562, 578–79 (Lumpkin, J., specially concurring) (Okl. Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

**50.** *Pickens,* 850 P.2d at 339–40; *Woodruff v. State,* 846 P.2d 1124, 1148–49 (Okl.Cr.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1994); *Castro v. State,* 844 P.2d 159, 176 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Clayton v. State,* 840 P.2d 18, 34 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

LaFevers argues that this instruction was sandwiched into the instructions for aggravating circumstances, all of which required unanimity. The record reveals that Instructions 3–6 do not touch on unanimity requirements; Instruction 7 defines aggravating circumstances and requires unanimity; Instruction 8 defines mitigating circumstances and does not discuss unanimity; Instruction 9 lists specific mitigating circumstances and does not discuss unanimity; Instruction 10 requires the jury to unanimously find at least one aggravator then unanimously find that it outweighs any mitigator before considering the death penalty; Instruction 11 requires jurors to unanimously find an aggravator and reduce that finding to writing, but does not require written or unanimous findings of any mitigators; Instruction 12 again requires a unanimous verdict for imposition of the death penalty, or life imprisonment with or without parole. The distinctions between aggravating factors and mitigating circumstances are clear and unambiguous.

Court has consistently rejected this argument.[51]

In Proposition XVI, LaFevers claims that instructions given to the jury on the issue of mitigation permitted jurors to ignore mitigating evidence. LaFevers complains that Instruction No. 8 defined mitigating circumstances as those which "may be" considered as extenuating or reducing moral culpability or blame. He argues that this permissive language gave the jury discretion to ignore any potentially mitigating evidence. LaFevers fails to cite or distinguish the numerous cases in which this Court has determined that "may be" reflects the correct constitutional standard and avoids any infringement on the jury's duty to determine individual punishment.[52]

In Proposition XVII, LaFevers contends that the statutory requirement that a jury list aggravating circumstances as specific findings of fact before the death penalty may be imposed is unconstitutional. Oklahoma's death penalty statutes require that 1) a list of statutory aggravating circumstances accompany the jury's general verdict of death; 2) the jury must find the aggravating circumstances unanimously beyond a reasonable doubt; and 3) the jury must make specific findings of fact on particular questions of fact when determining the existence of each aggravating circumstance. 21 O.S.1991, § 701.11. LaFevers argues that this scheme conflicts with Article 7, § 15, of the Oklahoma Constitution, which requires general jury verdicts and prohibits any law from requiring trial courts to direct a jury to make findings of particular questions of fact. LaFevers acknowledges that this Court has addressed this issue and determined that the constitutional provision goes to the determination of guilt or innocence while the death

penalty scheme sets forth procedures the jury should use when determining punishment in a capital case.[53] LaFevers argues that *Romano* was wrongly decided because its underlying analysis was misguided.

*Romano* analogized to an Oklahoma Supreme Court case construing a comparative negligence statute, where the case turned on whether special jury forms precluded a general verdict.[54] LaFevers mischaracterizes both *Smith* and the holding in *Romano*: the issue in *Smith* was not whether the statute itself required a special or general verdict, and *Romano* held that a death sentence determination did not amount to a verdict, but was analogous to a general verdict. LaFevers correctly points out that this Court has previously referred to the death sentence as a verdict,[55] and argues that *Black's Law Dictionary* definition of "verdict" as a formal jury finding on matters submitted to them for decision means that the death sentence determination must be a verdict. Here the dictionary reference is inapposite because *Romano* clearly distinguishes the "sentencing verdict" from a true jury verdict of guilt or innocence. LaFevers' unpersuasive attack on *Romano's* reasoning offers this Court no reason to reconsider this issue.

In Proposition XVIII, LaFevers argues that the aggravating circumstance of "heinous, atrocious or cruel" is facially invalid in that the trial court's instruction to the jury did not adequately channel the jury's discretion, thereby depriving LaFevers of a fair and reliable sentence. Instruction No. 6, which exactly corresponded to OUJI–CR Instruction 436, defined "heinous, atrocious or cruel" and directed the jury to crimes where the victim's death was preceded by torture or serious physical abuse. LaFevers again fails to cite or distinguish the numerous cases in

---

51. *See, e.g., Malone,* 876 P.2d at 715; *Woodruff,* 846 P.2d at 1149.

52. *Pickens,* 850 P.2d at 339–340; *Revilla,* 877 P.2d at 1153–54; *Brown,* 871 P.2d at 74; *Williamson,* 812 P.2d at 409.

53. *Romano,* 847 P.2d at 384–385; *Carter v. State,* 879 P.2d 1234, 1251 (Okl.Cr.1994); *Mitchell,* 884 P.2d at 1203.

54. *Romano,* 847 P.2d at 385. *See Smith v. Gizzi,* 564 P.2d 1009 (Okl.1977).

55. *Davis v. State,* 665 P.2d 1186, 1203 (Okl.Cr. 1983).

which this Court has consistently upheld this aggravating circumstance when so limited.[56]

In Proposition XIX, LaFevers claims that the "continuing threat" aggravating circumstance as applied in Oklahoma is unconstitutionally vague and overbroad. LaFevers claims that this Court has upheld this circumstance on evidence of the crime alone to support his contention that continuing threat is standardless, vague and overbroad. This Court has held that the State must "present sufficient evidence concerning prior convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue in the future" to support this aggravating circumstance.[57] The most common grounds for this aggravating circumstance include a history of violent conduct, including unadjudicated offenses, the facts of the homicide of which the defendant was convicted, and other grounds including threats, lack of remorse, attempts to prevent calls for help, testimony of experts, and mistreatment of family members. This Court has consistently rejected this argument in numerous cases LaFevers does not acknowledge.[58]

In Proposition XX, LaFevers challenges any sentencing analysis by this Court if an aggravating circumstance on which the jury relied in imposing a death sentence is invalidated. LaFevers acknowledges that appellate reweighing is proper under certain circumstances, but claims that this Court cannot engage in the reweighing process using the aggravating circumstance of "continuing threat" without affording him notice and a right to be heard on the validity of such aggravating circumstance at the time of (re)sentencing. This is an interesting argument but, as all the aggravating circumstances found by the jury were proper, the issue is moot.

LaFevers argues in Proposition XXI that his death sentence must be vacated because the "avoid arrest or prosecution" aggravating circumstance is being applied and interpreted in an unconstitutionally vague and overbroad manner. LaFevers argues that this aggravating circumstance is standardless, ignoring authority which requires a predicate crime separate from the murder for which a defendant seeks to avoid arrest.[59] This aggravating circumstance requires a determination of the state of mind of the defendant, which may be inferred from circumstantial evidence.[60] Evidence showed that Hawley was killed because she could identify LaFevers and Cannon as the persons who broke into her house and stole her car.

In Proposition XXII, LaFevers contends his death sentence must be vacated because it was imposed pursuant to a balancing scheme based solely upon unconstitutional aggravating circumstances in a state which affords a due process right to jury sentencing. LaFevers argues that, since Oklahoma

**56.** *See, e.g., Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Hooks v. State*, 862 P.2d 1273, 1282 (Okl.Cr.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Clayton v. State*, 840 P.2d at 30; *Stafford v. State*, 832 P.2d 20, 23 (Okl.Cr.1992); *Rojem v. State*, 753 P.2d 359, 369 (Okl.Cr.1988), *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988). LaFevers does not complain that insufficient evidence supports this aggravating circumstance. Evidence showed that Hawley was beaten in her home, robbed, kidnapped, kept in the trunk of her car, dragged from the car, beaten again, set on fire, moved 10 to 15 feet while burning, and lived for approximately five more hours. Ample evidence supports this aggravating circumstance.

**57.** *Malone*, 876 P.2d at 717.

**58.** *Mitchell*, 884 P.2d at 1207; *Hogan v. State*, 877 P.2d 1157, 1162 (Okl.Cr.1994); *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994); *Revilla*, 877 P.2d at 1152–53; *Brown*, 871 P.2d at 72–73; *Ellis*, 867 P.2d at 1301; *Paxton*, 867 P.2d at 1325; *Trice*, 853 P.2d at 220–221; *Pickens*, 850 P.2d at 339. LaFevers does not specifically argue insufficiency of the evidence, and adequate evidence supported this circumstance, including the prior threats to Hawley, the contemporaneous attack on the Padens, and the surrounding circumstances of the crime. Evidence of unadjudicated prison stabbings also supported the jury's finding. I have consistently disagreed with the use of unadjudicated offenses to support this aggravating circumstance.

**59.** *Barnett v. State*, 853 P.2d 226, 233–34 (Okl.Cr. 1993); *Mitchell*, 884 P.2d at 1207; *McGregor*, 885 P.2d at 1385.

**60.** *Mitchell*, 884 P.2d at 1207; *Rojem*, 753 P.2d at 368.

defendants have a due process liberty interest in jury sentencing, as a practical matter this Court cannot reweigh aggravating circumstances since juries do not make written findings of fact on mitigating circumstances and this Court cannot determine what factors the jury considered. As the aggravating circumstances found in this case were constitutional, the Court need not consider this proposition.

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.Supp.1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances.

Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C).

The jury was instructed on and found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) there was a probability that LaFevers would commit criminal acts of violence that would constitute a continuing threat to society; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting modification, the judgments and sentences of the District Court of Oklahoma County are **AFFIRMED.**

JOHNSON, P.J., and LUMPKIN and STRUBHAR, JJ., concur.

LANE, J., concurs in result.

LUMPKIN, Judge, concurring.

I concur in the Court's decision but would hold that Appellant's exhibits A & B, attached to his brief, are not a proper part of the record on appeal. The exhibits were not offered and admitted as a part of the trial court proceedings and should not be considered here.

## ORDER DENYING PETITION FOR REHEARING AND DIRECTING ISSUANCE OF MANDATE

Loyd Winford LaFevers was tried by jury before the Honorable Thomas C. Smith in the District Court of Oklahoma County. In Case No. CRF–85–3254 he was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7, and Third Degree Arson in violation of 21 O.S.1981, § 1403(A), After Former Conviction of a Felony. At the conclusion of the first stage of trial, the jury returned a verdict of guilty. During sentencing, the jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that LaFevers would commit criminal acts of violence that would constitute a continuing threat to society; and 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. LaFevers was sentenced to death for the murder conviction and forty years incarceration for arson.

By its May 16, 1995, published opinion, this Court affirmed LaFevers' convictions and sentences. LaFevers is now before the Court on a Petition for Rehearing, Rule 3.14, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp.1995, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall be filed for two reasons only:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

LaFevers raises four propositions in his Petition for Rehearing which fail to meet the criteria set forth in Rule 3.14. Accordingly, these propositions will not be addressed.[1]

---

**1.** LaFevers mistakenly suggests the Court's opinion is contrary to the United States Supreme Court's decision in *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362

IT IS THEREFORE THE ORDER OF
THE COURT that the Petition for Rehearing is DENIED. The Clerk of the Court is
directed to issue the mandate forthwith.

IT IS SO ORDERED.

/s/ Charles A. Johnson
CHARLES A. JOHNSON,
Presiding Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL,
Vice–Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN,
Judge

/s/ James F. Lane
JAMES F. LANE,
Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR,
Judge

(1994). In fact this Court determined the interrogating officer acted in conformity with *Davis* when he questioned LaFevers in order to clarify his ambiguous statement. *LaFevers v. State*, 897 P.2d 292, —— (Okl.Cr.1995).